Filed 3/8/21  P. v. Uriostegui CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SERGIO URIOSTEGUI,<br><br>Defendant and Appellant. | F078168<br><br>(Super. Ct. No. 16CR06864)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Merced County.  Ronald W. Hansen, Judge.*

Daniel G. Koryn, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Harry Joseph Colombo, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

*Retired Judge of the Merced Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**SEE CONCURRING OPINION**

## INTRODUCTION

Defendant Sergio Uriostegui shot two women and was spotted by an officer running from the scene with a gun in his hand. Defendant threw the gun aside and tried to hide behind a trash can when he saw the officer. A jury convicted defendant of two counts of assault with a semiautomatic firearm, possession of a firearm by a felon, and possession of ammunition by a felon in connection with the incident and found true great bodily injury allegations. Following a bifurcated trial, the court found true allegations defendant had suffered two prior strike convictions also qualifying as prior serious felony convictions and that he had served a prior prison term.

On appeal, defendant challenges his convictions, arguing the court committed reversible error in instructing the jury with CALCRIM No. 371 (Consciousness of Guilt: Suppression and Fabrication of Evidence) based on his discarding the gun. He further argues his case should be remanded for the court to consider whether to strike the imposed prior serious felony enhancement (Pen. Code, § 667, subd. (a)) in light of the passage of Senate Bill No. 1393 (2017–2018 Reg. Sess.) (Senate Bill 1393), and he challenges the imposition of various fines and fees. Finally, in supplemental briefing, the parties agree defendant's prison prior enhancement should be stricken in light of the passage of Senate Bill No. 136 (2019–2020 Reg. Sess.) (Senate Bill 136).

We remand for the trial court to hold a resentencing hearing to exercise its newfound discretion pursuant to Senate Bill 1393 and to strike the prison prior enhancement and for further proceedings consistent with this opinion. In all other respects, we affirm the judgment.

## FACTUAL BACKGROUND

On October 18, 2016, D.G. was shot in the street outside her apartment and J.S. was shot inside D.G.'s apartment. Defendant was charged in connection with the incident after D.G. identified him as the shooter.

*Prosecution evidence*

At trial, Officer Rogelio Rodriguez testified he was patrolling around 1:04 a.m. on October 18, 2016, when he saw an SUV and began to follow it. The car stopped and parked at the curb, and Officer Rodriguez saw at least four males exit and walk toward an apartment on the 1100 block of O Street, which they entered. Officer Rodriguez continued driving several blocks down, parked, and turned off his lights, "completely blacked out." He then saw the SUV's lights turn on and it began traveling towards him. Officer Rodriguez noticed the driver was talking on his cellular phone when he passed, so Officer Rodriguez conducted an enforcement stop for the violation. After conducting the traffic stop, Officer Rodriguez drove towards the address where he had seen the people exit the SUV and approached with his lights off. He then made a U-turn and saw four "muzzle flashes" (a muzzle flash is a small visible explosion that occurs when a gun is fired). Officer Rodriguez also heard "approximately four distinctive gunshots." He believed he was the subject of the gunfire. He radioed into dispatch and reported he was being fired upon. He accelerated and immediately left. He parked near an alley, turned off his lights, and exited the car with his flashlight in one hand and pistol in the other.

He then saw someone running toward him at full speed. Officer Rodriguez flashed his light on the person and saw defendant's face and a firearm in defendant's hand. With his firearm drawn, Officer Rodriguez told defendant to get on the ground. Defendant threw his firearm away towards a trash can and slid onto the ground and hid behind another trash can. Officer Rodriguez retrieved the firearm, which was a black semiautomatic nine-millimeter pistol; it was warm to the touch, suggesting it had been recently fired, and there was the distinctive smell of gun smoke or gunpowder emanating from it. The police retrieved expended nine-millimeter cartridge casings from the sidewalk and bullet fragments from inside D.G.'s home. The expended cartridge cases were later traced to the firearm defendant discarded.

3.

Officer Natalia Enero responded to Officer Rodriguez's call. As Officer Enero was driving towards the scene, D.G. staggered into the road towards Officer Enero's car. Officer Enero's body camera captured the encounter. D.G. reported to Enero that defendant shot her in the arm; she identified him by his first and last name. She explained defendant was talking about the father of one of D.G.'s children and saying, "Fuck him," because he was no longer in a gang. D.G. reported she was shot while behind a car that was parked on the street. D.G. had a gunshot wound that went through her arm.

Detectives Chris Russell and Joe Deliman interviewed D.G. while she was in the hospital in the early morning hours after the shooting. D.G. again identified defendant as the shooter. The prosecution played an audio recording of a portion of the interview with D.G.

During the interview, D.G. explained a female friend named J.S. was at her house and they were drinking when J.S. invited defendant over; he arrived with two other males, brought them "a bottle," and then left. D.G. reported she knew defendant through her child's father, who was friends with defendant in "the gang life." Defendant returned approximately 30 minutes later by himself and looked "like he was on drugs or something." They were drinking when defendant said "fuck DOs," referring to gang dropouts; he then showed D.G. he had a gun and pointed it at her. D.G. explained the father of one of her children was no longer active in a gang. D.G. asked defendant not to point the gun at her. Then, J.S. said, "'I wish you would fuckin' shoot me. Shoot me.'" Defendant then shot J.S. D.G. ran out of her apartment and hid behind a parked car. Defendant found D.G. and shot her in the arm. She "faked dead" and did not see where defendant went.

During the interview, D.G. also identified defendant as the shooter in a photographic lineup. She explained he was wearing a black hoodie that night, and the prosecution introduced a photograph of defendant from that evening depicting him in a

4.

black hoodie. At trial, Detective Russell confirmed D.G. identified defendant as the shooter in the photographic lineup bearing her signature and in which defendant's photograph was circled.

Contrary to her previous statements to police, at trial, D.G. testified she was shot in the arm on October 18, 2016, but she "hardly remember[ed] anything because [she] was so intoxicated." She testified she did not know who shot her. She stated she met J.S. that day but did not recall how she met her. They were drinking at D.G.'s house. She did not recall if defendant was in her apartment that night and denied reporting to the police that he was when she was in the hospital; she testified she had never seen defendant before. She also testified she was intoxicated and "drugged up" while in the hospital and did not recall speaking to anyone. When asked about the photographic lineup, D.G. testified she did not recall signing anything or talking to anyone.

J.S. testified she was shot in her neck, chest, and arm in October of 2016. She was in the hospital for days. The last thing she recalled before going to the hospital was "hanging out" with her friend D.G. at D.G.'s house. She went to D.G.'s house around 11:00 a.m. that morning and they started drinking liquor. At some point they left the house to get more alcohol. J.S. did not recall inviting anyone over. She testified she "blacked out" at around 2:00 p.m. and did not remember anything from that whole day. J.S. testified she knew defendant, but it was years ago when they used to hang out. She also denied recalling if defendant was the person who shot her in D.G.'s house.

*Defense evidence*

Defendant called D.G.'s neighbor Jose G. in his defense. Jose testified he was home in the very early morning hours of October 18, 2016, when he heard two gunshots. He looked out the window and saw more than two people outside; he could not discern whether they were male or female because it was dark. He saw two people turn and run down the street.

5.

*Verdict and Sentencing*

The jury found defendant guilty of assault with a semiautomatic weapon on J.S. (Pen. Code, § 245, subd. (b); count 1), enhanced by an allegation he personally inflicted great bodily injury upon her (§ 12022.7, subd. (a)), assault with a semiautomatic weapon on D.G. (§ 245, subd. (b); count 2), enhanced by an allegation he personally inflicted great bodily injury upon her (§ 12022.7, subd. (a)), possession of a firearm by a felon (§ 29800, subd. (a)(1); count 3), and possession of ammunition by a felon (§ 30305, subd. (a)(1); count 4). The court also found true enhancement allegations to counts 1 and 2 that defendant suffered two prior convictions that qualified as both serious felony convictions (§ 667, subd. (a)(1)) and strike priors and that resulted in a prior prison term (§ 667.5).

The court sentenced defendant to 27 years to life on count 1, enhanced by three years for the great bodily injury enhancement, five years for a Penal Code section 667, subdivision (a)(1) enhancement, and one more year for a prison prior enhancement, for a total aggregate sentence of 36 years to life on count 1. The court sentenced defendant to 27 years to life on count 2, consecutive, enhanced by three years for the great bodily injury enhancement, for a total aggregate sentence of 30 years to life. The court sentenced defendant to six years on both counts 3 and 4 but stayed those sentences pursuant to section 654.

## DISCUSSION

### I. The Court Did Not Reversibly Err in Instructing the Jury With CALCRIM No. 371

Defendant first contends the court reversibly erred in instructing the jury with CALCRIM No. 371 (Consciousness of Guilt: Suppression and Fabrication of Evidence). We find no prejudicial error.

### A. Relevant Factual and Procedural History

During trial, defense counsel objected to the inclusion of CALCRIM No. 371, which relates to consciousness of guilt based on suppression and fabrication of evidence,

6.

in the jury instructions. Defense counsel argued "it is a reasonable interpretation … that the gun was thrown because an officer approached [defendant] … pointing a gun at him, and that [defendant] threw down his weapon so he wouldn't get shot." She asserted that was "a very reasonable interpretation of what someone would do in that situation and not that he was trying to hide evidence of a crime." The court responded, "[T]he evidence is susceptible to a different interpretation, that when he saw the officer and both were surprised, that he tossed the gun to hide it. He didn't just drop it. He tossed it." Defense counsel argued defendant tossed the gun away from his person so that he could not have access to it and the officer would not shoot him for having access to a weapon. The court noted, "There's interpretation either way" and held it was going to give the instruction.

Accordingly, the court instructed the jury, "If the defendant tried to hide evidence, that conduct may show he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

During summation, the prosecutor argued defendant's attempt to get rid of the weapon "shows that he knows he's guilty." Defense counsel countered there were two reasonable conclusions why defendant could have tossed the gun: to hide it because he was being confronted by an officer or acting for his own safety "so that he is not armed at the moment when that officer has his firearm pulled on him." Defense counsel also argued if both conclusions are reasonable, the jury "must accept the conclusion that points to innocence over the one that points to guilt."

B.      Standard of Review

We review de novo the legal adequacy of an instruction. (*People v. Posey* (2004) 32 Cal.4th 193, 218; *People v. Cole* (2004) 33 Cal.4th 1158, 1210.) We must ascertain the relevant law and determine whether the given instruction correctly stated it. (*People v. Kelly* (1992) 1 Cal.4th 495, 525–526.) "The trial court has the duty to instruct on

7.

general principles of law relevant to the issues raised by the evidence [citations] and has the correlative duty 'to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues.' [Citation.] 'It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference [citation].' [Citation.]" (*People v. Saddler* (1979) 24 Cal.3d 671, 681.)

"'[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation.' [Citation.] In reviewing an ambiguous instruction, we inquire whether there is a reasonable likelihood that the jury misunderstood or misapplied the instruction in a manner that violates the Constitution. [Citation.] 'A single instruction is not viewed in isolation, and the ultimate decision on whether a specific jury instruction is correct and adequate is determined by consideration of the entire instructions given to the jury.'" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 906; accord, *People v. Williams* (2013) 56 Cal.4th 630, 688.) If error is found under state law, it is assessed for prejudice using the standard described in *People v. Watson* (1956) 46 Cal.2d 818, the question being whether the defendant has demonstrated a reasonable probability of obtaining a more favorable result had the error not occurred. (*People v. Moore* (2011) 51 Cal.4th 1104, 1130.)

### C. Applicable Law

"An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action." (Evid. Code, § 600, subd. (b).) A permissive inference or presumption allows—but does not require—the trier of fact to infer an elemental fact from proof by the prosecutor of a basic fact. (*Ulster County Court v. Allen* (1979) 442 U.S. 140, 157.) There should be a

"'rational connection' between the basic facts that the prosecution proved and the ultimate fact presumed, and the latter is 'more likely than not to flow from' the former." (*Id*. at p. 165.) A "permissive presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference." (*Id*. at p. 157.) "'[A] permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury.'" (*People v. Yeoman* (2003) 31 Cal.4th 93, 131.) "'[A] reasonable inference … "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] … A finding of fact must be an inference drawn from evidence rather than … a mere speculation as to probabilities without evidence." [Citation.]'" (*People v. Davis* (2013) 57 Cal.4th 353, 360.)

Facts giving rise to a consciousness of guilt instruction need not be conclusively established; rather, there need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference. (*People v. Alexander* (2010) 49 Cal.4th 846, 921; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102.)

### D.     Analysis

Defendant contends CALCRIM No. 371 "acted as an improper factual pinpoint instruction in favor of conviction" because it was not supported by sufficient evidence. He argues the jury would have had to speculate to conclude defendant threw the gun in order to conceal it; it was not a rational inference to conclude his tossing of the gun evidenced a consciousness of guilt. Accordingly, he asserts CALCRIM No. 371 provided an improper permissive inference that "unconstitutionally shifted the balance of instructions against the defense in violation of the state and federal constitutional guarantee of due process of law and in violation of the Fifth, Sixth, and Fourteenth

9.

Amendments to the United States Constitution." He generally argues consciousness of guilt instructions "do not comport with due process" given the prohibition against defense instructions stating innocence can be inferred from the lack of guilty behavior. He asserts the instructional error was prejudicial and, accordingly, his convictions should be reversed. The People respond the jury could have reasonably inferred defendant threw his gun to try to hide it from Officer Rodriguez; so, the trial court correctly instructed the jury with CALCRIM No. 371. They further contend any alleged error was harmless because at most, the instruction "'was superfluous.'" We agree with the People.

As defendant acknowledges, the California Supreme Court has repeatedly rejected claims that consciousness of guilt instructions like CALCRIM No. 371 and its predecessor, CALJIC No. 2.06, are constitutionally defective because they allow the jury to draw irrational inferences of guilt or because they are impermissibly argumentative because they "pinpoint" the prosecutor's argument regarding how the jury should view certain evidence. (See *People v. Alexander*, *supra*, 49 Cal.4th at p. 922; *People v. Hartsh* (2010) 49 Cal.4th 472, 505; *People v. Taylor* (2010) 48 Cal.4th 574, 630; *People v. Hughes* (2002) 27 Cal.4th 287, 348; *People v. Jackson* (1996) 13 Cal.4th 1164, 1222–1224; see also *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 336, 438 [rejecting defendant's claim consciousness of guilt instructions were unnecessary, improperly argumentative, and invited jury to draw irrational inferences as "defeated by settled precedent"]; *People v. Holloway* (2004) 33 Cal.4th 96, 142 ["The inference of consciousness of guilt from … suppression of evidence is one supported by common sense, which many jurors are likely to indulge even without an instruction"].) We have neither the authority nor the inclination to overrule these cases. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Additionally, where there is circumstantial evidence the defendant attempted to rid himself of a weapon, instructing the jury with CALCRIM No. 371 is proper. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1100, 1139–1140 [CALJIC No. 2.06—predecessor to

10.

CALCRIM No. 371—properly given based on circumstantial evidence defendant threw murder weapon out window of moving car]; *People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1290, 1296–1297 [CALJIC No. 2.06 properly given based on circumstantial evidence defendant threw murder weapon down gutter].) And here, there was sufficient evidence from which the jury could reasonably conclude defendant attempted to hide his firearm—he threw his gun towards a trash can when he saw Officer Rodriguez before defendant himself attempted to hide—and that such conduct evidenced a consciousness of guilt; thus, the court did not err by instructing the jury with CALCRIM No. 371. In so concluding, we reject defendant's contention the evidence did not support a rational inference defendant's conduct reflected a consciousness of guilt. Additionally, even if, as defendant argues, the evidence could have supported an alternate inference, there was sufficient evidence to support an inference of consciousness of guilt. (See *People v. Lucas* (1995) 12 Cal.4th 415, 471 [despite alternative interpretation of evidence of flight, sufficient evidence existed from which jury could infer defendant fled out of guilty knowledge; "The instruction properly left it to the jury to determine which inference was more reasonable"]; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1243–1244 [instruction on flight as showing consciousness of guilt was permissible even though there was possible innocent explanation for defendant's actions]; see also *People v. Alexander*, *supra*, 49 Cal.4th at p. 922 [despite conflicting evidence, prosecution presented sufficient evidence to raise an inference defendant tried to persuade witness to testify falsely, which supported consciousness of guilt instruction].) Indeed, the instruction simply allowed the jury to infer consciousness of guilt *if* it found defendant attempted to hide evidence.

We further conclude any alleged error in giving CALCRIM No. 371 was harmless under both the *Chapman* and *Watson* standards of review. The evidence against defendant was very strong. D.G. identified defendant as the shooter immediately following the incident and at the hospital shortly thereafter; she also identified him in a photographic lineup while she was in the hospital. Defendant was caught fleeing the

11.

scene with a warm nine-millimeter gun in his hand and to which three of the cartridges at the scene could be traced. Furthermore, the trial court informed the jury some instructions may not apply, and the jury is presumed to have understood and followed the instructions it was given and disregarded the consciousness of guilt instruction if the evidence did not support it. (*People v. Sandoval* (2015) 62 Cal.4th 394, 422; *People v. Pearson* (2013) 56 Cal.4th 393, 414.)

Finally, CALCRIM No. 371 does not lessen the prosecution's burden of proof; rather, it makes clear to the jury that defendant's conduct could indicate consciousness of guilt, while also clarifying such activity is by itself insufficient to prove defendant's guilt, allowing the jury to determine the weight and significance of defendant's conduct. (See *People v. Jackson*, *supra*, 13 Cal.4th at p. 1224.) "The cautionary nature of the instruction[] benefit[ted] the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory"; thus, it "did not improperly endorse the prosecution's theory or lessen its burden of proof." (*Ibid*.) Accordingly, even if we were to assume error, we cannot conclude defendant was prejudiced by the referenced instruction.

We reject defendant's contention.

## II.     Remand for Consideration of Senate Bill 1393

Defendant next argues his case should be remanded for a resentencing hearing to permit the court to exercise its discretion regarding whether to strike his prior serious felony enhancement imposed pursuant to Penal Code section 667, subdivision (a).

### A.     Relevant Procedural History

Before the sentencing hearing, defense counsel requested a continuance until after the passage of Senate Bill 1393:

> "[DEFENSE COUNSEL:] I don't know if the Court is aware of SB-1393. It's a Senate Bill allowing the Court discretion in striking nickel priors. It's currently on the governor's desk ready to be signed, but it has

passed.  [¶] My request would be to continue this sentencing at least until we know whether or not that's going to be signed into law.  I think it is relevant in this case. Obviously, the Court may choose not to grant that discretion, but this new law would allow that discretion if the Court would be willing to consider it.  [¶] So other than that, I am ready to go forward today.  But I do think that if that becomes law, it will make a difference in terms of sentencing and the arguments I can make.

"THE COURT:  Well, you're talking about a continuance of several months.

"[DEFENSE COUNSEL]: Well—

"THE COURT:  Probably past January before—

"[DEFENSE COUNSEL]:  If—if it does get signed—I mean, my suggestion would be if we can come back next month to see if it—I mean, if it doesn't get signed, then we're not going to have to deal with it anyway. We don't need to set out sentencing to January.  But if it does get signed, though, yes, it would be effective January, and I would be asking to come back in January.

"THE COURT:  Yes.  Well, I do acknowledge that the current approach as far as the legislature, including the governor, is to try to reduce prison populations.  I'm not sure this five-year sentence is going to reduce—

"[DEFENSE COUNSEL]:  Well, Your Honor, it would be—

"THE COURT:  —the prison population for the nickel prior enhancement is going to be that beneficial to [defendant].

"[DEFENSE COUNSEL]:  I understand the Court's position.  He is obviously facing a substantial amount of time.  But I do think, you know, any years could make a difference in—[¶] … [¶] … —parole.  I can't say exactly, but I still would be making that request.

"THE COURT:  Well, you know, even if I was granted discretion, this is—this is a pretty serious crime.  He shot two women point-blank who were unarmed.  The first woman he shot was because she dated or was associating with a dropout.  The motive on the second woman, I assume, was because she was a witness to the first shooting.  [¶] Those are pretty cold-hearted actions.  I'm not sure he would prevail on his request for the Court to exercise discretion, particularly with his criminal history.  [¶] So, you know, that combined with the sentence … it's a lengthy sentence.…

13.

Whether the *Romero* is granted or not, it's a very lengthy sentence. The request for a continuance is denied."

**B.     Analysis**

Defendant contends his case should be remanded to permit the court to exercise its newfound discretion and consider whether to strike the prior serious felony enhancement imposed pursuant to Penal Code section 667, subdivision (a). The People argue the record does not support a remand because it reflects the trial court "was disinclined to reduce [defendant's] sentence by striking either or both of his prior 'strike' convictions," and in light of the court's comments regarding defendant's extensive criminal history and that the instant crimes were "particularly heinous." We agree with defendant, however, that he is entitled to a remand on this basis.

Senate Bill 1393, signed into law on September 30, 2018, amends Penal Code sections 667 and 1385 to provide the trial court with discretion to dismiss, in furtherance of justice, five-year enhancements imposed pursuant to section 667, subdivision (a)(1) (Stats. 2018, ch. 1013, §§ 1, 2). The new law took effect on January 1, 2019. The law is applicable to those parties, like defendant, whose appeals were not final on the law's effective date. (See *In re Estrada* (1965) 63 Cal.2d 740, 748.)

The California Supreme Court has held, when a court is unaware of the scope of its discretionary powers, "the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.'" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

Here, defendant was sentenced in this case on September 19, 2018, before Senate Bill 1393 was signed and took effect. Though the court was made aware of the potential future enactment of Senate Bill 1393, at the time of sentencing, it did not have the discretion to strike defendant's section 667, subdivision (a) enhancements. Additionally, before sentencing, the court stated it was "not sure [defendant] would prevail on his

14.

request for the Court to exercise discretion" pursuant to Senate Bill 1393 if the legislation was enacted; accordingly, it held that a continuance of the sentencing hearing was not warranted on that basis. While the court refused to strike defendant's prior strike convictions pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, and noted during the sentencing hearing the seriousness of the instant crimes and defendant's extensive criminal history, it remains that at the time defendant was sentenced, the court lacked the discretion to strike defendant's prior serious felony enhancements. And we cannot conclude the record before us "'clearly indicate[s]'" the trial court would not have struck the imposed enhancement if it had the discretion to do so. Rather, the trial court's comments before the sentencing hearing suggest it was not sure whether it would strike the prior serious felony enhancement if the sentencing hearing were continued until after Senate Bill 1393 was approved and became effective.

Accordingly, because defendant is entitled to be sentenced in the exercise of informed discretion, remand is appropriate so the trial court may exercise its discretion in the first instance in light of the amendments to Penal Code sections 667 and 1385. We further note defendant was charged with two prior convictions that qualified as serious felony enhancements under section 667, subdivision (a)(1) and that also formed the basis of the charged prior prison enhancement. The court found defendant had suffered the two prior convictions and that the People had proven the enhancement allegations beyond a reasonable doubt. Though both convictions are listed under the charged section 667, subdivision (a)(1) enhancement allegation in the first amended information, the court only sentenced defendant to one 5-year term for a prior serious felony enhancement and one 1-year term for a prior prison enhancement on count 1. However, the California Supreme Court has held "that when multiple statutory enhancement provisions are available for the same prior offense, one of which is a section 667 enhancement, the greatest enhancement, but only that one, will apply." (*People v. Jones* (1993) 5 Cal.4th 1142, 1150.) Accordingly, the court appears to have erred in applying the prior prison

15.

enhancement instead of two prior serious felony enhancements. Accordingly, on remand we further order the court to revisit its sentencing decision in light of the California Supreme Court's guidance in *People v. Jones*, *supra*, at page 1150.

**III.    Senate Bill 136**

In supplemental briefing, defendant contends his one-year prior prison term enhancement imposed pursuant to Penal Code section 667.5, former subdivision (b) must be stricken in light of Senate Bill 136, which was signed into law on October 8, 2019, and became effective on January 1, 2020. The People concede Senate Bill 136 applies retroactively to this case and the prison prior enhancement should be stricken. (See *In re Estrada*, *supra*, 63 Cal.2d at p. 742.) On remand, we direct the trial court to strike this enhancement.

At the time defendant was charged, convicted, and sentenced, Penal Code section 667.5, former subdivision (b), provided, in part:

> "[W]here the new offense is any felony for which a prison sentence or a sentence of imprisonment in a county jail under subdivision (h) of Section 1170 is imposed or is not suspended, in addition and consecutive to any other sentence therefor, the court shall impose a one-year term for each prior separate prison term or county jail term imposed under subdivision (h) of Section 1170 or when sentence is not suspended for any felony …."

After defendant was sentenced, but while his case was still pending on appeal, the Legislature enacted Senate Bill 136 (Stats. 2019, ch. 590, § 1). Effective January 1, 2020, Penal Code section 667.5, subdivision (b), now provides, in pertinent part:

> "[W]here the new offense is any felony for which a prison sentence or a sentence of imprisonment in a county jail under subdivision (h) of Section 1170 is imposed or is not suspended, in addition and consecutive to any other sentence therefor, the court shall impose a one-year term for each prior separate prison term for a sexually violent offense as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code …."

In other words, a prior prison term enhancement will only apply if a defendant served the prior prison term for a qualifying sexually violent offense. The Legislature did not

expressly declare or in any way indicate it did not intend Senate Bill 136 to apply retroactively. "When an amendatory statute … lessens the punishment for a crime …, it is reasonable for courts to infer, absent evidence to the contrary and as a matter of statutory construction, that the Legislature intended the amendatory statute to retroactively apply to the fullest extent constitutionally permissible—that is, to all cases not final when the statute becomes effective. [Citations.]" (*People v. Garcia* (2018) 28 Cal.App.5th 961, 972.)

We conclude Senate Bill 136 applies retroactively to this case and, because defendant's prior prison term was not served for sexually violent offenses, the related enhancement imposed pursuant to Penal Code section 667.5, former subdivision (b) is now unauthorized and must be stricken on remand.

## IV.    Fees and Fines

At the sentencing hearing, the court ordered defendant to pay a $10,000 restitution fine under Penal Code section 1202.4, subdivision (b) and a $10,000 parole revocation restitution fine under section 1202.45, which was stayed "if he[ were] ever able to complete parole." The court also ordered defendant to pay a $160 fine pursuant to section 1465.8, and a $120 criminal conviction assessment under Government Code section 70373. The record does not reflect defendant requested an ability to pay hearing at any time.

Defendant argues the court violated his due process rights by imposing the $160 court operations fees (Pen. Code, § 1465.8) and $120 court facilities fees (Gov. Code, § 70373) without determining whether he had the present ability to pay these amounts. Defendant's due process argument is based on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), which was decided after defendant was sentenced and while his current appeal was pending. *Dueñas* held that "[d]ue process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay"

17.

before it imposes or requires defendant to pay certain fines or fees. (*Id.* at p. 1164, see *id.* at p. 1167; accord, *People v. Castellano* (2019) 33 Cal.App.5th 485, 488–491; contra, *People v. Allen* (2019) 41 Cal.App.5th 312, 325–330 [rejecting the defendant's *Dueñas*-based due process claim and her equal protection claim]; *People v. Hicks* (2019) 40 Cal.App.5th 320, 326–329, review granted Nov. 26, 2019, S258946 [rejecting *Dueñas*'s due process analysis]; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1061, 1071–1072 [disagreeing with *Dueñas*'s due process analysis and concluding constitutional challenge to fines, fees and assessments should be made under the excessive fines clause of the 8th Amend.].)[1]

Relying on *Dueñas*, defendant asserts the fees must be vacated, the $10,000 restitution fine and the $10,000 parole revocation fee must be stayed, and the matter remanded for the court to determine his ability to pay. He notes he "was indigent and was represented at trial by appointed counsel" and "is represented on appeal by appointed counsel."

We need not reach this claim for two reasons. First, because defendant failed to object to the fines below, he arguably has forfeited review of this claim on appeal. (*People v. Aviles*, *supra*, 39 Cal.App.5th at p. 1073.) Second, because the issue is pending review in the California Supreme Court (see fn. 1, *ante*) and we must remand this matter for consideration of other sentencing issues, defendant may, if he chooses, raise this factual issue in the trial court in the first instance.

## DISPOSITION

The matter is remanded to the trial court for a new sentencing hearing to permit the trial court to exercise its discretion regarding whether to strike the prior serious felony

---

[1]The California Supreme Court is currently considering whether trial courts must consider a defendant's ability to pay before imposing or executing fines, fees, and assessments; and if so, which party bears the applicable burden of proof. (See *People v. Kopp* (2019) 38 Cal.App.5th 47, 94–98, review granted Nov. 13, 2019, S257844.)

enhancement in light of Senate Bill 1393, to strike the enhancement imposed under Penal Code section 667.5, former subdivision (b), and for further proceedings consistent with this opinion.  In all other respects, the judgment is affirmed.


                                                                                      PEÑA, J.

I CONCUR:


DE SANTOS, J.

POOCHIGIAN, Acting P.J., Concurring.

I concur with the majority opinion's disposition for remand and conclusion that it is not necessary for this court to address defendant's contentions about the amount of the restitution fine at this time. (See, e.g., *People v. Buycks* (2018) 5 Cal.5th 857, 893 [explaining the " 'full resentencing' " rule]; *People v. Acosta* (2018) 29 Cal.App.5th 19, 26; *People v. Rosas* (2010) 191 Cal.App.4th 107, 117–121 [restitution and parole revocation fines are not a severable part of a judgment and are within scope of a remand for resentencing]); *People v. Burbine* (2003) 106 Cal.App.4th 1250, 1257–1259.)

I write separately to reaffirm my stated position in *People v. Aviles* (2019) 39 Cal.App.5th 1055 (*Aviles*), that *People v. Dueñas* (2019) 30 Cal.App.5th 1157 was wrongly decided and an Eighth Amendment analysis is more appropriate to determine whether restitution fines, fees, and assessments in a particular case are grossly disproportionate and thus excessive. (*Aviles*, at pp. 1068–1072.)

When the court imposes a restitution fine greater than the $300 statutory minimum amount, "[s]ection 1202.4 expressly contemplates an objection based on inability to pay," and defendant's failure to object results in forfeiture of the issue. (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153 (*Frandsen*); *Aviles, supra*, 39 Cal.App.5th at p. 1073.) Such a forfeiture rule has been consistently followed. (*People v. Trujillo* (2015) 60 Cal.4th 850, 853–854; *People v. Nelson* (2011) 51 Cal.4th 198, 227; *People v. Gamache* (2010) 48 Cal.4th 347, 409.) While the court imposed a restitution fine of $10,000 in this case, and defendant did not object, forfeiture is not applicable given the need for remand and possible resentencing.

On remand, however, the imposition of certain fees and assessments is mandatory. If the court again imposes a restitution fine above the statutory minimum, the defendant retains the statutory ability to object to that amount, and could make a record to further show his inability the mandated assessments in support of an overall Eighth Amendment

objection.  (*Aviles, supra*, 39 Cal.App.5th at pp. 1073–1074; *Frandsen, supra*, 33 Cal.App.5th at p. 1154.)

POOCHIGIAN, Acting P.J.